**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **IN RE:** | **CHAPTER 11** |
| **AP FRAMING, INC,** | **CASE NO. 20-68856-jwc** |
| **Debtor.** | |

**PLAN OF REORGANIZATION**

**Dated this 6th day of November, 2020**

Filed by:

**AP Framing, Inc.**

Attorney for Debtor
Cameron M. McCord, Esq.
Jones & Walden, LLC
699 Piedmont Ave NE
Atlanta, Georgia 30308
(404) 564-9300

COMES NOW AP Framing, Inc., Debtor and Debtor in possession in the above-captioned case ("Debtor"), and, pursuant to sections 1123, 1189, and 1190 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), proposes this Plan of Reorganization (the "Plan") for the resolution of the Claims against Debtor.  Debtor is the proponent of this Plan as required under section 1191 of the Bankruptcy Code.

## Article 1
## Contents of the Plan; Required Disclosures

1.      *Subchapter V Plan of Reorganization*. This Plan is filed under Subchapter V of Chapter 11 of the Bankruptcy Code.

2.      *History of the Debtor's Business Operations*.

Debtor was incorporated in the State of Georgia in 2011. As its business, Debtor is a commercial framing company located at 595 Old Norcross Road, Suite A, Lawrenceville, Georgia 30046 (the "Business"). Debtor's sole shareholder and CEO is Mr. Uriel Espinoza. From 2011 through approximately 2016, Debtor worked as a labor only provider for framing on large commercial apartment complex projects throughout the southeastern United States.  From approximately 2016 through 2019, Debtor provided turn-key service where the Debtor would provide both labor and materials.  Unfortunately, Debtor underbid some of these jobs and did not allocate enough funds to account for materials necessary to rework any errors that arose during the job.  This caused Debtor to fall behind to its primary lumber supplier, 84 Lumber, Inc.  As of the Petition Date, Debtor was indebted to 84 Lumber in the approximate amount of $1,400,000.00.

Additionally,  on December 4, 2019, Steadfast Insurance Company filed a claim with the American Arbitration Association, Case No 01-19-0000-4437 (the "Arbitration") asserting claims against the Debtor in the approximate amount of $3,400,000.00 for (i) breach of contract and negligence as it relates to the Debtor's performance on a project located at the Plaza Midwood Apartments, 1000 Central Avenue, Charlotte, North Carolina (the "Project").  Debtor disputes the amount of damages alleged in the Arbitration.  At different times during the Project, Debtor held insurance policies with Western World Insurance Company, First Mercury Insurance Company and StarStone National Insurance Company (the "Insurance Policies").  Debtor has filed claims under the Insurance Policies regarding the Arbitration.  The final hearing was scheduled for the end of September 2020, but was stayed due to the Bankruptcy Case.

Debtor filed bankruptcy on August 10, 2020 to reorganize its financial affairs without the threat of collection.

3.      *Current Management and Employees*.

3.1.      Directors and Officers of Reorganized Debtor.

Uriel Espinoza will remain the CEO of the Debtor and continue to receive a salary of $250,00.00 per year.

2

### 3.2. Insiders Employed by Reorganized Debtor.

Mr. Espinoza's ex-wife, Evelyn Espinoza, works as the Debtor's office manager and receives a salary of approximately $120,000.00 per annum.  Mr and Mrs. Espinoza's daughter, Wendolyn Espinoza, works as Debtor's book keeper and is paid $17 per hour.

### 4. *Liquidation Analysis.*

The Debtor has minimal assets other than accounts receivables which would be likely be greatly reduced in value in the event of a liquidation as the general contractors would exercise their right of recoupment to allow for direct payments to laborers and vendors. Holders of claims would not receive any greater return in a liquidation of Debtor's assets.  Moreover, in liquidation, the trustee would incur costs associated with liquidation such as broker fees.  Conversion and liquidation under Chapter 7 of the Bankruptcy Code would result in the appointment of a Chapter 7 trustee and the liquidation of assets.  Assets disposed of by "liquidation" or "fire" sale generate significantly less proceeds than assets that are marketed and sold as a going concern.  Additionally, a Subchapter V trustee or Chapter 7 trustee would incur trustee's fees pursuant to § 326(a) or § 330 of the Bankruptcy Code.[1]

### 5. *Alternative Confirmation Standards Under Section 1191(a) and (b).* Debtor seeks to confirm this Plan by obtaining the consent of all Impaired Classes provided for in this Plan by a majority in number and two-thirds in amount of Allowed Claims actually voting. If Debtor succeeds in obtaining the consent of all Impaired Classes, the provisions of the Plan referencing and operating under section 1191(a) of the Bankruptcy Code will apply. If Debtor is unable to obtain the consent of all Impaired Classes, Debtor will request the Court to confirm the Plan under 1191(b). In this case, the provisions of the Plan referencing and operating under section 1191(b) of the Bankruptcy Code will apply.

### 6. *Property and Claims.*  This Plan deals with all property of Debtor and provides for treatment of all Claims against Debtor and its property.

---

[1] 11 USC § 326(a) states that a Chapter 7 trustee would incur trustee's fees equal to 25% of the first $5,000 of Liquidation Value of Assets; 10% of amount in excess of $5,000 but not in excess of $50,000 of Liquidation Value of Assets; 5% of any amount in excess of $50,000 but not in excess of $1,000,000; 3% of any amount in excess of $1,000,000 of the Liquidation Value of Asset, and commissions for auctioneers for personal property generally is equivalent to ten (10%) percent of the gross sales price and commissions for real property brokers is generally six percent (6%) of the gross sales price. In addition, the attorney for the Chapter 7 trustee would incur attorney's fees as would the current Chapter 11 attorneys.

11 USC § 330 provides for reasonable compensation for actual, necessary services rendered by the Subchapter V trustee and reimbursement for actual, necessary expenses. The Subchapter V trustee's hourly rate is $450.00.

**Article 2**
**Definitions and General Provisions**

For the purposes of this Plan, except as otherwise expressly provided or unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in this Article of the Plan.  Any term that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term therein.

2.1     *Definitions.* The following terms, when used in this Plan, shall have the following meaning:

2.1.1   "*Administrative Expense Claim*" means a Claim for payment of an administrative expense entitled to priority under section 507(a)(2) of the Bankruptcy Code.

2.1.2   "*Allowed Claim*" shall mean a Claim or any portion thereof that is enforceable against Debtor or enforceable against the property of Debtor under sections 502 or 503 of the Bankruptcy Code.

2.1.3   "*Allowed Secured Claim*" shall mean the amount of the allowed Claim held by parties secured by property of Debtor which is equal to the amount provided by the Plan unless such other amount is stipulated as constituting the allowed secured claim between the parties, or such amount as the Bankruptcy Court allows.

2.1.4   "*Allowed Unsecured Claim*" shall mean Allowed Claims which are not allowed administrative, priority, or secured claims.

2.1.5   "*Assets*" means, collectively, all of the property, as defined by section 541 of the Bankruptcy Code, of the Estate of Debtor (including without limitation, all of the assets, property, interests (including equity interests) and effects, real and personal, tangible and intangible, including all Avoidance Actions), wherever situated as such properties exist on the Effective Date or thereafter.

2.1.6   "*Avoidance Action*" means any claim or cause of action of the Estate arising out of or maintainable pursuant to sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or any other similar applicable law, regardless of whether such action has been commenced prior to the Effective Date.

2.1.7   "*Ballot*" means each of the ballot forms that are distributed with the Plan to Holders of Claims included in the Classes that are Impaired under this Plan and are entitled to vote.

2.1.8   "*Bankruptcy Case*" means the chapter 11 case initiated by Debtor's filing on the Filing Date of a voluntary petition for relief in the Bankruptcy Court under Subchapter V of Chapter 11 of the Bankruptcy Code.

2.1.9   "*Bankruptcy Code*" means title 11 of the United States Code.

2.1.10 "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.

2.1.11 "*Bankruptcy Rules*" means, collectively, the Federal Rules of Bankruptcy Procedure.

2.1.11. "*Bar Date"* means October 19, 2020, which is the date established by the Court as the deadline for nongovernmental entities to file a proof of claim pursuant to docket number 13 (the "Bar Notice"). The terms of the Bar Notice will continue in full effect after the Effective Date.

2.1.12 "*Business Day*" means any day on which the commercial banks are required to be open for business in Atlanta, Georgia and which is not a weekend or legal holiday recognized by the Bankruptcy Court or the Superior Courts of the State of Georgia.

2.1.13 "*Cash*" means legal tender of the United States of America and equivalents thereof.

2.1.14 "*Causes of Action*" means all Avoidance Actions and any and all of Debtor's actions, suits, accounts, agreements, promises, rights to payment and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, unsecured, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise.

2.1.15 "*Chapter 11*" means chapter 11 of the Bankruptcy Code.

2.1.16 "*Claim*" means a claim against Debtor whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

2.1.17 "*Classes*" means a category of Claims described in this Plan.

2.1.18 "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order.

2.1.19 "*Confirmation Hearing*" means the hearing before the Bankruptcy Court held to consider confirmation of this Plan and related matters under section 1191 of the Bankruptcy Code, as such hearing may be continued.

2.1.20 "*Confirmation Order*" means the order confirming this Plan pursuant to section 1191 of the Bankruptcy Code that the Bankruptcy Court enters, which shall be in all respects reasonably acceptable to Debtor.

2.1.21 "*Debtor*" shall mean AP Framing, Inc., the debtor in this Bankruptcy Case.

2.1.22 Intentionally Omitted.

2.1.23  "*Disallowed Claim*" means a Claim or any portion thereof that: (i) has been disallowed by a Final Order, (ii) is listed in any of Debtor' Schedules at zero, unknown, contingent, disputed, or unliquidated and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court, or (iii) is not listed in Debtor' Schedules and as to which a proof of claim bar date has been established but no proof of claim has been timely filed or deemed timely filed with the Bankruptcy Court.

2.1.24  "*Disputed Claim*" means, with reference to any Claim, a Claim or any portion thereof, that is the subject of an objection timely filed in the Bankruptcy Court and which objection has not been withdrawn, settled or overruled by a Final Order of the Bankruptcy Court.

2.1.25  "*Distribution*" means any distribution by Debtor or reorganized Debtor to a Holder of an Allowed Claim.

2.1.26  "*District Court*" means the United States District Court for the Northern District of Georgia, Atlanta Division.

2.1.27  "*Effective Date*" means the date that is 60 days after entry of a Confirmation Order.

2.1.28  "*Estate*" means, with regard to Debtor, the estate that was created by the commencement by Debtor of the Bankruptcy Case pursuant to section 541 of the Bankruptcy Code, and shall be deemed to include, without limitation, any and all rights, powers, and privileges of such Debtor and any and all interests in property, whether real, personal or mixed, rights, causes of action, avoidance powers or extensions of time that such Debtor or such estate shall have had as of the commencement of the Bankruptcy Case whether by virtue of sections 541, 544, 545, 546, 547, 548, 549 or 550 of the Bankruptcy Code, or otherwise. In the event that this Plan is confirmed by the Bankruptcy Court under section 1191(b) of the Bankruptcy Code, such definition shall also include (1) all of the property defined by section 541 of the Bankruptcy Code and (2) any earnings from services performed by the Debtor after the commencement of the Bankruptcy Case but before the Bankruptcy Case is closed, dismissed, or converted to a case under Chapter 7, 12, or 13, whichever occurs first.

2.1.29  "*Executory Contract or Unexpired Lease*" means all executory contracts and unexpired leases to which Debtor is a party.

2.1.30  "*Filing Date*" means August 10, 2020.

2.1.31  "*Final Distribution*" means the Distribution by Debtor or reorganized Debtor that satisfies all Allowed Claims to the extent provided in accordance with the Plan.

2.1.32  "*Final Distribution Date*" means the Distribution Date on which the Final Distribution is made.

2.1.33 "*Final Order*" means an order of the Bankruptcy Court, the District Court, or any other court as to which (i) any appeal that has been taken has been finally determined or dismissed, or (ii) the time for appeal has expired and no appeal has been filed timely. In the case of an order of the Bankruptcy Court, the time for appeal, for purposes of this definition, shall be the time permitted for an appeal to the District Court.

2.1.34 "*Government Bar Date*" in accordance with 11 U.S.C. §502, is 180 days after the order for relief (here the Filing Date) and means February 8, 2021.

2.1.34.1 "*Holder*" means a holder of a Claim or Interest, as applicable.

2.1.35 "*Impaired*" shall have the meaning ascribed thereto in section 1124 of the Bankruptcy Code.

2.1.36 "*Initial Distribution Date*" means the Effective Date.

2.1.37 "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

2.1.38 "*Person*" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

2.1.39 "*Plan*" means this plan of reorganization as same may hereafter be corrected, amended, supplemented, restated, or modified.

2.1.40 "*Priority Claim*" means a Claim entitled to priority under the provisions of section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

2.1.41 "*Priority Tax Claim*" means a Claim against Debtor that is of a kind specified in sections 507(a)(8) of the Bankruptcy Code.

2.1.42 "*Professional Compensation*" means (1) any amounts that the Bankruptcy Court allows pursuant to section 330 of the Bankruptcy Code as compensation earned, and reimbursement of expenses incurred, by professionals employed by Debtor and the fees and expenses of the Subchapter V Trustee, and (2) any amounts the Bankruptcy Court allows pursuant to sections 503(b)(3) and (4) of the Bankruptcy Code in connection with the making of a substantial contribution to the Bankruptcy Case.

2.1.43 "*Record Date*" means any date established in the Confirmation Order or any other Final Order of the Bankruptcy Court for determining the identity of holders of Allowed Claims entitled to Distributions under this Plan. If no Record Date is established in the Confirmation Order or any other order of the Bankruptcy Court prior to the Confirmation Date, then the Record Date shall be the Confirmation Date.

7

2.1.44 "*Record Holder*" means the Holder of a Claim as of the Record Date.

2.1.45 "*Released Parties*" means Debtor.

2.1.46 "*Retained Action*" means all claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which Debtor or Debtor' Estate may hold against any Person, including, without limitation, (i) claims and Causes of Action brought prior to the Effective Date, (ii) claims and Causes of Action against any Persons for failure to pay for products or services provided or rendered by Debtor, (iii) claims and Causes of Action relating to strict enforcement of Debtor's intellectual property rights, including patents, copyrights and trademarks, (iv) claims and Causes of Action seeking the recovery of Debtor's accounts receivable or other receivables or rights to payment created or arising in the ordinary course of Debtor' business, including without limitation, claim overpayments and tax refunds, and (v) all Causes of Action that are Avoidance Actions.

2.1.47 "*Schedules*" means the Schedules of Assets and Liabilities Debtor filed in the Bankruptcy Case, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

2.1.48 "*Secured Claim*" means a Claim against Debtor to the extent secured by a Lien on any property of Debtor on the Petition Date to the extent of the value of said property as provided in section 506(a) of the Bankruptcy Code.

2.1.49 "*Subchapter V Trustee*" means Tamara Miles Ogier who was appointed by the United States Trustee under section 1183(a) of the Bankruptcy Code to serve as the Subchapter V trustee in this Bankruptcy Case, and any successor trustee to Todd Hennings.

2.1.50 "*Subordinated Claim*" means any Unsecured Claim that is subordinated in priority to all other Allowed Unsecured Claims pursuant to the provisions of section 510 of the Bankruptcy Code or other applicable law.

2.1.51 "*Unimpaired*" means, with respect to a Class of Claims or Interests, any Class that is not Impaired.

2.1.52 "*Unsecured Claim*" means any Claim against Debtor that is not a Secured Claim, a Priority Claim, a Priority Tax Claim, or an Administrative Expense Claim.

2.2    *Time*.  Whenever the time for the occurrence or happening of an event as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Georgia, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.

2.3    *Events of Default*.    Unless otherwise specifically provided in a class under the Plan, in the event of a default by Debtor in payments or otherwise pursuant to Class 1 - 8 under the Plan, the Holder must send written notice ("Default Notice") to Debtor at the addresses of

record for Debtor as reflected on the docket for this Bankruptcy Case, unless Debtor has provided the Holder with a written notice of a change of address. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Debtor has ten (10) days (in the case of a monetary default) and thirty (30) days (in the case of a non-monetary default) from receipt by Debtor and Debtor's counsel of the Default Notice (or the following business day if the 10th or 30th day does not fall on a business day) to cure such default (and the address for payment, which will accept overnight deliveries, in the event of a monetary default). The Holder must send such Default Notice to (a) Debtor via certified mail or recognized overnight carrier with a copy to Debtor via email or fax and (b) by certified mail to Cameron M. McCord and Leon S. Jones (Jones & Walden, LLC) at the address reflected in the then current directory of the State of Bar of Georgia with a copy via email or fax. In the event the Plan is confirmed under 1191(b), the Holder must also provide a copy of the Default Notice to the Subchapter V Trustee at the address reflected on the case docket. Debtor shall have ten (10) days or thirty (30) days (as applicable) from Debtor's and Debtor's counsel's receipt of the Default Notice to cure such default. Receipt by Debtor's Attorney or the Subchapter V Trustee shall not be deemed receipt by Debtor of the required Default Notice. Notwithstanding anything to the contrary in the Plan or otherwise, a default under one Class of Claims or sub-class of Claims shall not constitute a default under any other Class of Claims or sub-class of Claims. (For example a default under Class 1 shall not constitute a default under Class 2). In the event of a default under the Plan as to any creditor or creditors and Debtor cures any such default, then the terms of the Plan shall remain in effect and Debtor shall then be deemed to be in compliance with the Plan and the injunction as to such creditor or creditors shall be and remain unaffected without further order, action or notice, and without limitation, such creditor or creditors shall be enjoined from taking any actions prohibited by the terms of the Plan (including without limitation Section 11.5 of the Plan). In the event of an uncured default, then such creditor may take any action provided for by law to enforce the terms of the Plan, but the injunction of the Plan shall remain in place to prohibit any action other than to enforce the terms of the Plan.

     2.4   *Notices*. All notices under the Plan shall be in writing. Unless otherwise specifically provided herein, all notices shall be sent to Debtor via U.S. Certified Mail Return Receipt or by recognized overnight carrier to the address of record for Debtor in this Case, unless Debtor has provided such Holder with written notice of change of address for Debtor, with a copy via email or fax and certified mail or nationally recognized overnight delivery service to Cameron M. McCord and Leon Jones at the address reflected in the then current directory of the State Bar of Georgia. In the event the Plan is confirmed under 1191(b), all notices under the Plan must also be provided to the Subchapter V Trustee at the address reflected on the case docket. Receipt of notice by Cameron M. McCord and Leon Jones (Jones & Walden, LLC) or the Subchapter V Trustee shall not be deemed receipt by Debtor of the required notice. Notice to creditors may be provided (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records. Notices shall be deemed received: (i) on the day transmitted if sent via fax or email and (ii) on the day delivered if sent via nationally recognized overnight delivery service or

Certified Mail Return Receipt.

**Article 3**
**Classification of Claims and Interests**

3.1    Summary.  The categories of Claims and Interests set forth below classify all Claims against Debtor for all purposes of this Plan.  A Claim or Interest shall be deemed classified in a particular Class only to the extent the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  The treatment with respect to each Class of Claims and Interests provided for in Article 4 shall be in full and complete satisfaction, release and discharge of such Claims and Interests.

3.2    Classes:

    1.1.    Class 1 shall consist of the Secured Claim of the U.S. Small Business Administration.

    1.2.    Class 2 shall consist of the Secured or Priority Tax Claim of the Internal Revenue Service.

    1.3.    Class 3 shall consist of the Secured or Priority Tax Claim of the Georgia Department of Revenue.

    1.4.    Class 4 shall consist of the Priority or Secured Tax Claims of Governmental Units Not Otherwise Classified.

    1.5.    Class 5 shall consist of the General Unsecured Claims.

    1.6.    Class 6 shall consist of the Unsecured Claim of Steadfast Insurance Company.

    1.7.    Class 7 shall consist of the Unsecured Claims of Counterparties to Debtor's Executory Contracts.

    1.8.    Class 6 shall consist of the Equity Claims.

**Article 4**
**Treatment of Claims and Interests**

The Classes, the treatment of each Class, and the voting rights of each Class are set forth below.

Debtor reserves the right to pay any claim in full at any time in accordance with the terms of the Plan (i.e. at the percentage distribution designated in the Plan and including any accrued and unpaid interest, if any) without prepayment penalty.

### 4.1    Class 1:  Secured Claim of the U.S. Small Business Administration

Class 1 shall consist of the Secured Claim of the U.S. Small Business Administration.

The U.S. Small Business Administration ("SBA") asserts a secured claim in the amount of $149,900.00 (the "SBA Secured Claim"). To secure its claim, the SBA asserts first priority liens upon and security interest in all of Debtor's "tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tor claims, (j) general intangibles, including payment intangibles and software and (i) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacement for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto" (the "SBA Collateral"). The security interest in the SBA Collateral is evidenced by that certain UCC Financing Statement recorded and filed June 24, 2020 in the UCC index of Coweta County, Georgia as File No 038-02020-030816.

Debtor shall pay the SBA Secured Claim as follows: Beginning on the 1st day of the month when such payment first becomes due under the SBA Promissory Note, Debtor shall make principal and interest payments to the SBA based upon a 347 month amortization schedule. Debtor shall pay the SBA the monthly payment amount on the SBA Secured Claim of $731.00. Debtor shall continue to make such $731.00 principal and interest payments on the 1st day of each month through and including the 347th month following the Effective Date. On the 1st day of the 348th month following the Effective Date, Debtor shall make a final payment of any accrued but unpaid interest as well as any remaining principal outstanding on the SBA Secured Claim. Interest shall continue to accrue at the rate of 3.75% per annum.  The SBA shall retain its lien on the SBA Collateral and said lien shall be valid and fully enforceable to the same extent, validity, and priority as existed on the Filing Date. Upon receipt of payment in full of the SBA Secured Claim, The SBA shall release its lien on the SBA Collateral.  Any payments paid to the SBA after the Filing Date but before the Effective Date, including any adequate protection payments, shall be applied to the principal balance of the SBA Secured Claim.

There shall be no pre-payment penalty. The Claim of the SBA is Impaired by the Plan and the SBA is entitled to vote.

Nothing herein shall constitute an admission as to the nature, validity, or amount of claim. Debtor reserves the right to object to any and all claims.

**4.2      Class 2:  Secured or Priority Tax Claims of the Internal Revenue Service**

The Internal Revenue Service (the "IRS") filed proof of claim number 3 on September 1, 2020 which asserts priority unsecured claims totaling $10,829.84 and unsecured penalties of $6,190.62.  (the secured claim and the priority claim are hereinafter referred to as "Class 2 IRS Tax Claim").  Debtor shall pay the remaining Allowed Class 2 IRS Tax Claim in equal monthly payments commencing on the first anniversary of the Effective Date and continuing on the 15th day of each following month (or the next Business Day if anniversary dates are not a business day) with the last payment and the balance of the Class 2 IRS Tax Claim, if any, due on July 1, 2025.

Interest shall accrue on the principal amount of the Class 2 IRS Tax Claim from the Effective Date until paid in full at the annual rate of 3% per annum. With respect to any federal tax lien under 26 U.S.C. § 6321 and duly noticed under 26 U.S.C. § 6323 prior to the Filing Date that secures the Class 2 IRS Tax Claim, the IRS shall retain such federal tax lien as to any property of the Estate, and any proceeds thereof, to the same extent, validity, and priority as existed on the Filing Date.  Notwithstanding any other provision of this Plan, any such federal tax lien shall not be satisfied, discharged, or released unless and until the Class 2 IRS Tax Claim is paid in full, with interest as provided herein, or as provided under applicable non-bankruptcy law provided, however, that upon sale of the Real Property as provided under this Plan, the IRS will agree to release its lien with respect to the Real Property upon such sale, and any remaining balance on the Class 2 IRS Tax Claim shall be paid as set forth above.

The IRS may amend the Class 2 IRS Tax Claim up and until the Government Bar Date, which is February 8, 2020, unless that date is extended by the Court. By no later than the Effective Date, the Debtor shall duly file all required federal tax returns or forms, including any outstanding IRS Forms 941, that are or will come due under applicable non-bankruptcy law on or before the Effective Date. To the extent any such return or form is not filed on or before the Effective Date, then, notwithstanding any other provision of this Plan, the corresponding tax liability shall not be discharged under the Plan and may be paid outside the Plan.

Upon passage of the Government Bar Date, any claim asserted or assertable by the IRS on or before the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. § 502(i) shall: (i) be time barred and fixed as provided in the Plan, subject to Debtor's right to object to the same and (ii) any other, additional or amended claim assessable on or prior to the Filing Date shall be disallowed in its entirety and forever discharged. Debtor shall pay any claim of the IRS assessable, arising prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. § 502(i) on the terms herein, and the IRS shall be permanently enjoined from seeking payment in excess of the amounts provided for in the Plan for such claims.

A failure by the Debtor to make a payment on the Class 2 IRS Tax Claim to the IRS pursuant to the terms of the Plan shall be an event of default as to the IRS. In the event of a default under Class 2, the IRS must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries. Receipt by Debtor's attorney shall not be deemed receipt by Debtor of the required Default Notice. In the event of an uncured default under Class 2

following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the IRS may (a) enforce the entire amount of its then outstanding Allowed Class 2 IRS Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law, including the administrative enforcement provisions of the Internal Revenue Code, to assess and collect any unassessed, outstanding federal tax liability, or any assessed, outstanding federal tax liability, including the Allowed Class 2 IRS Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of the IRS that is not otherwise assessable or due and payable on or prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. § 502(i) shall, and the right of the IRS, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the IRS would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code. Debtor reserves the right to pay any tax claim in full at any time.

Notwithstanding Section 11.2 and any other provision of this Plan, nothing in this Plan or the Confirmation Order thereon shall discharge a federal tax debt of the kind specified in 11 U.S.C. § 523(a).

Notwithstanding Section 11.4 and any other provision of this Plan, nothing in this Plan or the Confirmation Order thereon shall bar or enjoin the IRS from assessing or collecting any federal tax liability or penalty against a non-debtor third-party. Further, nothing in this Plan or the Confirmation Order thereon shall exculpate or limit the liability of any non-debtor third-party for any federal tax debt.

The Claim of the Class 2 Creditor is not Impaired by the Plan and the holder of the Class 2 Claim is conclusively deemed to have accepted the plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 4.3    Class 3:    Secured or Priority Tax Claims of the Georgia Department of Revenue

Class 3 shall consist of any Secured Claim or Priority Tax Claim against Debtor held by the Georgia Department of Revenue (the "GDR") which was assessable or due and payable prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. § 502(i) (the "Class 3 GDR Tax Claim"). As of the date of the filing of this Plan, Debtor did not schedule a claim by the GDR nor has the GDR file a proof of claim.

The Government Bar Date for filing proofs of claim is fixed by 11 U.S.C. §502 and is February 8, 2021. Upon passage of the Government Bar Date, any claim asserted or assertable by the GDR on or before the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. §502(i) shall: (i) be time barred and fixed as provided in the Plan, subject to Debtor's right

to object to the same and (ii) any other, additional or amended claim assessable on or prior to the Filing Date shall be disallowed in its entirety and forever discharged. Debtor shall pay any claim of the GDR assessable, arising prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. §502(i) on the terms herein, and the GDR shall be permanently enjoined from seeking payment in excess of the amounts provided for in the Plan for such claims. After the Government Bar Date, any estimated claim of the GDR shall be capped at (i) if a proof of claim was timely filed, the amount provided in the proof of claim filed by the GDR prior to the Bar date or (ii) if no proof of claim is timely filed, the amount provided in Debtor's schedules, unless the Debtor scheduled such amount as unliquidated, contingent or disputed, in which case such amounts will be $0.00.

The Class 3 GDR Tax Claim estimated at $0.00 shall be paid pursuant to Class 3, and any GDR general unsecured tax claim (stated as $0.00 in the GDR proof of claim) is specifically classified as and will be paid pursuant to the General Unsecured Class 5. In the event the GDR holds an Allowed Class 3 GDR Tax Claim, Debtor shall pay the Allowed Class 3 GDR Tax Claim in 60 equal monthly payments each commencing on the 28th day of the month of the Effective Date (i.e. estimated at January 28, 2020) and continuing by the 28th day of each subsequent month until paid in full. Notwithstanding anything to the contrary herein, Debtor shall pay the balance of the Allowed Class 3 GDR Tax Claim on the 5-year anniversary of the Filing Date (i.e. August 10, 2025) unless the GDR agrees to a longer payment term, which such agreement may be communicated by the GDR continuing to accept monthly payments after August 10, 2025. Interest shall accrue on the principal tax balance of the Class 3 Tax Claim at the annual rate of 7.75% or such lesser rate as agreed to by the GDR. Any third-party payments or payments in excess of the scheduled distribution pursuant to Class 3 received by the Georgia Department of Revenue shall be applied to the principal tax obligation of the Class 3 GDR Tax Claim owed by Debtor pursuant to Class 3. Debtor's Class 3 payments shall be applied in the following order: (i) interest accruing on the Class 3 Tax Claim after the Effective Date under the Plan, (ii) the taxes included in the Class 3 GDR Tax Claim and (iii) interest and penalties which accrued prior to the Filing Date and Effective Date. Debtor is not aware of any secured claim held by the GDR.

A failure by the Debtor to make a payment on the Class 3 GDR Tax Claim to the GDR pursuant to the terms of the Plan shall be an event of default as to the GDR. In the event of a default under Class 3, the GDR must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries. Receipt by Debtor's attorney shall not be deemed receipt by Debtor of the required Default Notice. In the event of an uncured default under Class 3 following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the GDR may (a) enforce the entire amount of its then outstanding Allowed Class 3 GDR Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class 3 GDR Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The amount of any claim of the GDR that is not otherwise assessable or due and payable on or prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. §502(i) shall, and the right of the GDR, if any, to payment in respect thereto shall (i) be determined

14

in the manner in which the amount of such Claim and the rights of the GDR would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code.  However, the rights and treatment of the GDR and obligations and liability of Debtor or its property regarding any claim of the GDR against Debtor which was assessable or due and payable prior to the Filing Date or treated as arising prior to the Filing Date pursuant to 11 U.S.C. §502(i) shall be treated and fixed in accordance with the Plan, and any additional, other or amended claims assessable or due and payable prior to the Filing Date and not timely asserted or amended by the GDR in accordance with the Bankruptcy Code and the Plan and in all instances prior to entry of the Confirmation Order, shall be forever barred. Debtor reserves the right to pay any tax claim in full at any time.

The Claim of the Class 3 Creditor is not Impaired by the Plan and the holder of the Class 3 Claim is conclusively deemed to have accepted the plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 4.4   Class 4: Priority or Secured Tax Claims of Governmental Units Not Otherwise Classified

Class 4 shall consist of any Priority or Secured Claim of a governmental unit entitled to priority under 11 U.S.C. §507(a)(8), which are not otherwise specifically classified in the Plan ("Class 4 Governmental Unit Claim").  The amount of any claim of a Governmental Unit that is not assessed or assessable on or prior to the Effective Date, and the right of the particular governmental unit, if any, to payment in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the particular governmental unit would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to section 1141 of the Bankruptcy Code if applicable.  Debtor is not aware of any Holders of Class 4 Governmental Unity Claims not otherwise classified in the Plan. In the event there are Allowed Holders of Class 4 Governmental Unit Priority Tax Claims, Debtor shall pay such Allowed Class 4 Government Unit Priority Tax Claims at the rate of $100 per month commencing on the 28th day of the first full month following the Effective Date and continuing by the 28th day of each subsequent month (or the next Business Day if the 28th day is not a Business Day), with interest accruing at the annual rate of 5.5% or at the rate otherwise as required by the Bankruptcy Code, with a final balloon payment on the 5th anniversary of the Filing Date (i.e. August 10, 2025) unless such Holder agrees to a longer payment term, which such agreement may be communicated by the Holder continuing to accept monthly payments after August 10, 2025.  Debtor reserves the right to pay any Class 4 Governmental Unit Claim in full at any time.

A failure by the Debtor to make a payment under Class 4 to the Holder of a Class 4 Governmental Unit Tax Claim pursuant to the terms of the Plan shall be an event of default as to such Governmental Unit.  In the event of a default under Class 4, the Holder of a Class 4 Governmental Unit Tax Claim must send a Default Notice to Debtor in accordance with Article 2.3 of the Plan. Such Default Notice must contain the reason for the default and if such default is

monetary, the amount of the default and amount necessary to cure the default and the address for payment, which will accept overnight deliveries.  Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice.  In the event of an uncured default following proper Default Notice procedures and opportunity to cure pursuant to Article 2.3 of the Plan, the Holder of a Class 4 Governmental Unit Tax Claim may (a) enforce the entire amount of its then outstanding Allowed Class 4 Governmental Unit Tax Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law regarding the Allowed Class Governmental Unit Tax Claim; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

The Claims of the Class 4 Creditors are Impaired by the Plan and the holder of the Class 4 Claim is entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 4.5      Class 5: General Unsecured Claims

Class 5 shall consist of general unsecured claims not otherwise specifically classified in the Plan, including any deficiency claims pursuant to 11 U.S.C. §§ 506 and 522(f).

Debtor will pay the Holders of Class 5 General Unsecured Claims a pro-rata share of the Total Unsecured Distribution (i.e. $1,470,680.00) based on such Holder's Allowed Class 5 Claim as compared to the total of all Allowed Unsecured Claims in Classes 5, 6, and 7. Debtor shall pay such Unsecured Total Distribution in 5 payments of varying amounts (as detailed below) commencing on the 5th day of the 12th full month following the Effective Date (Class 5 Distribution 1) and continuing every year thereafter for a total of 5 distributions.  The Total Unsecured Distributions shall be as follows:

| Total Unsecured Distributions | |
|---|---|
| Unsecured Distribution 1 | $252,623.00 |
| Unsecured Distribution 2 | $276,512.02 |
| Unsecured Distribution 3 | $299,928.15 |
| Unsecured Distribution 4 | $301,031.71 |
| Unsecured Distribution 5 | $340,585.33 |
| **Total** | $1,470,680.21 |

Debtor's Total Unsecured Distributions equal the Debtor's projected disposable income after payment of certain Allowed Administrative Expenses, as reflected in Debtor's budget attached to the Plan as **Exhibit "A."**

Debtor anticipates and projects but does not warrant the following Holders of Class 5 Claims under Class 5, subject to the inclusion, if any, of claims held by creditors in Classes 6 and 7:

16

| Anticipated Holders | POC Number | Estimated Claim | Estimated Annual Distribution (/5) | Estimated Total Distribution | Estimated Percentage Total Distribution |
|---|---|---|---|---|---|
| 84 Lumber Company, LP | 9 | $1,385,651.00 | $158,098.14 | $790,490.71 | 57% |
| Action Rentals | | $179,437.62 | $20,473.23 | $102,366.16 | 57% |
| Ahern | 1 | $43,951.88 | $5,014.76 | $25,073.81 | 57% |
| American Express | 5 | $25,605.88 | $2,921.55 | $14,607.73 | 57% |
| American Express | | $2,242.67 | $255.88 | $1,279.41 | 57% |
| Bank of America | 4 | $124,838 | $14,243.60 | $71,217.99 | 57% |
| Bank of America | 11 | $113,063.66 | $12,900.19 | $64,500.93 | 57% |
| BSA | 2 | $0.00 | $0.00 | $0.00 | 0% |
| Capital One | 6 | $22,227.14 | $2,536.04 | $12,680.21 | 57% |
| Evelyn Espinoza | | $319,000.00 | $36,396.83 | $181,984.16 | 57% |
| Fastening Solutions, Inc. | 10 | $36,320.55 | $4,144.05 | $20,720.27 | 57% |
| IRS (Unsecured Portion) | 3 | $6,190.62 | $706.33 | $3,531.65 | 57% |
| MBCI | | $18,747.26 | $2,139.00 | $10,695.00 | 57% |
| Ram Tools | 16 | $22,672.58 | $2,586.87 | $12,934.33 | 57% |
| Scotts Hill | | $4,202.64 | $479.51 | $2,397.54 | 57% |
| Southern Carlson | | $12,324.13 | $1,406.14 | $7,030.71 | 57% |
| Sunbelt Rentals | | $86,362.29 | $9,853.65 | $49,268.24 | 57% |
| Synergy | | $5,481.81 | $625.46 | $3,127.28 | 57% |
| Trussway | 7 | $55,580.73 | $6,341.58 | $31,707.88 | 57% |
| Uriel Espinoza | | $27,200.00 | $3,103.43 | $15,517.14 | 57% |
| Vulcan Thread Products, Inc. d/b/a CLP Systems | 8 | $86,854.57 | $9,909.82 | $49,549.08 | 57% |
| **Total** | | **$2,577,955.03** | **$294,136.04** | **$1,470,680.22** | |

Notwithstanding anything else in this document to the contrary, any claim listed above shall be reduced by any payment received by the creditor holding such claim from any third party or other obligor, specifically including, but not limited to, pursuant to the Motion to Allow Third Party Payments of Prepetition Debt (Doc. No. 34), and the Second Motion to Allow Third Party Payments of Prepetition Debt (Doc. No. 52) and Debtor's obligations hereunder shall be reduced accordingly.

The Claims of the Class 5 Creditors are Impaired by the Plan and the holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 4.6    Class 6: <u>Unsecured Claim of Steadfast Insurance Company:</u>

Class 6 shall consist of any Unsecured Claim against Debtor held by Steadfast Insurance Company ("Steadfast") under the subcontractor agreement between Debtor and Batson-Cook Company (the "Class 6 Claim"). Steadfast filed proof of claim number 12 on September 16, 2020 which asserts unsecured claims totaling $3,054,978.00 for a subrogation claim for asserted default of this agreement.

Steadfast obtained relief from the automatic stay under a consent order with Debtor dated October 23, 2020 (Doc. No. 70). Steadfast will liquidate its claim against the Debtor, if any, by completion of American Association Arbitration Proceeding No. 01-19-0000-4437 (the "Arbitration Proceeding"). Debtor's insurance carriers have agreed to provide the Debtor with a defense under reservation of rights.

Debtor shall have no obligation to Steadfast until the following conditions precedent are satisfied: (1) the completion of the Arbitration Proceeding that results in an award in favor of Steadfast, (2) a Final order by a court of competent jurisdiction confirming any award in favor of Steadfast and (3) confirmation in writing by Debtor's insurance carriers that all amounts due and owing to Steadfast under such insurance policies have been paid, and (4) Steadfast's amendment of its proof of claim or other statement in writing reasonably acceptable to Debtor reducing its claim by such amounts received from Debtor's insurance carriers. If any amount remains outstanding owed by Debtor to Steadfast following the completion of such conditions precedent, then, beginning on the next Total Unsecured Distribution as provided for in Class 5, Debtor shall pay Steadfast's liquidated claim pro-rata with all other creditors entitled to participate in the next Total Unsecured Distribution and each subsequent distribution thereafter. For the avoidance of doubt, such payment shall be shall be based on the pro-rata amount of Steadfast's Allowed Class 6 Claim as compared to the Total Allowed Claims in Classes 5, 6, and 7.

Notwithstanding anything else in this document to the contrary, any claim listed above shall be reduced by any payment received by the creditor holding such claim from any third party or other obligor and Debtor's obligations hereunder shall be reduced accordingly.

The Claim of the Class 6 Creditor is Impaired by the Plan and the holder of the Class 6 Claims is entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 4.7    Class 7: <u>Unsecured Claim of Executory Contact Counterparties:</u>

Class 7 shall consist of any Unsecured Claim against Debtor held by (1) Freese Johnson, LLC ("Freese Johnson"), which filed proof of claim number 13 on October 16, 2020 asserting an unsecured claim of $252,548.68 allegedly for "services not performed under written contract", (2)

Samet Corporation ("Samet"), which filed proof of claim number 14 on October 16, 2020 asserting an unsecured claim of $155,313.81 allegedly under "subcontractor agreement", (3) Juneau Construction Company, LLC ("Juneau"), which filed proof of claim number 15 on October 16, 2020 asserting an unsecured claim of $57,355.00 allegedly for "contractual damages", and (4) any other timely-filed claim for rejection damages under an executory contract with the Debtor.

Debtor disputes all of the amounts asserted above and had sent demand letters to Freese Johnson and Samet on September 22, 2020 asserting a total due in excess of $330,000.00. Debtor anticipates filing objections to such claims.

Debtor shall pay any Allowed Class 7 Claim as allowed by Final Order of the Bankruptcy Court pro-rata with all other claims in Classes 5, 6, and 7 beginning on the beginning on the next Total Unsecured Distribution as provided for in Class 5 following the entry of such Final Order. For the avoidance of doubt, such payment shall be based on the pro-rata amount of such Allowed Class 7 Claim as compared to the Total Allowed Claims in Classes 5, 6, and 7.

The Claims of the Class 7 Creditors are Impaired by the Plan and the holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of such claim. Debtor reserves the right to object to any and all claims.

### 4.8    Class 8: Interest Claims:

Class 8 consists of the Interest Claims. Uriel Espinoza shall retain his interest in the shares in Debtor.

### Article 5
### Subchapter V Trustee

1.    *Subchapter V Trustee.*

The Subchapter V Trustee was appointed by the United States Trustee in this case to perform the duties described in section 1183(b) of the Bankruptcy Code, one of which is to facilitate the development of a consensual plan of reorganization.

7.    *Termination of the Subchapter V Trustee's Services.*

The services of the Subchapter V Trustee shall terminate upon "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code. Debtor shall directly make all payments required under this Plan, including the first payments required for substantial consummation of the Plan.

8.      *Compensation of the Subchapter V Trustee.*

The Subchapter V Trustee shall be entitled to apply for reasonable compensation for the Subchapter V Trustee's fees and expenses under 11 U.S.C. §§ 330 and 503(b)(3) periodically following confirmation of the Plan.

Debtor shall pay all compensation awarded the Subchapter V Trustee as agreed by Debtor and the Subchapter V Trustee or otherwise provided in Article 6 of the Plan. All unpaid accrued and approved compensation of the Subchapter V Trustee shall be paid in full by the Debtor as part of its Final Distribution.

## Article 6
## Treatment of Unclassified Claims

1.      *Summary.*  Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims against Debtor are not classified for purposes of voting on, or receiving Distributions under the Plan.  Holders of such Claims are not entitled to vote on the Plan.  All such Claims, are instead treated separately in accordance with Article 6 of the Plan and in accordance with the requirements set forth in sections 1129(a)(9)(A) and 1191(e) of the Bankruptcy Code, as applicable.

2.      *Jones & Walden, LLC.*  With respect to potential Administrative Expense Claims, Debtor, pursuant to Court order, retained the law firm of Jones & Walden, LLC ("Firm") to serve as bankruptcy counsel.  As set forth in the employment application and supporting documents, the Firm received a prepetition retainer in the amount of $ 35,000.00. As of the date hereof, the fees and expenses incurred by the Firm have not exceeded the retainer.  Debtor shall pay any unpaid allowed Administrative Expense Claim held by the Firm in accordance with Article 6.3 below.

3.      *Professional Fees of the Firm and SubV Trustee.*  Any Allowed Administrative Expense Claim of the Firm and the SubV Trustee shall be paid as set forth in Debtor's Budget pursuant to the line item "Professional Fees".  The Firm and SubV Trustee shall share said distributions pro-rata based on a fraction, the numerator of which is such holder's Allowed Administrative Expense Claim and the denominator of which is the total combined Allowed Administrative Expense Claims of the Firm and SubV Trustee. Said Allowed Administrative Expense Claims of the Firm and SubV Trustee shall not be discharged under the Plan.  In the event of a default in the payment of the Admin Claim J&W & Sub V Trustee distribution, the entire principal and interest due to said holder shall become due pursuant to the Plan upon demand and become and be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are expressly waived by Debtor.  Any remedy that is set forth in the Plan related to the Allowed Administrative Expense Claims of J&W or the SubV Trustee is not exclusive of any other remedies that are provided for herein or by law and the holder may commence an action to enforce the same, with this Plan being treated as and constituting a contract under Georgia law.

4.      *Administrative Expense Claims.*  Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, and unless otherwise specifically provided for in the Plan, each

holder of an Allowed Administrative Expense Claim (excluding the allowed claims of the Firm and Sub V Trustee) will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash on the latest of (1) the Effective Date, (ii) as soon as practicable after the date on which such Claim becomes an Allowed Administrative Expense Claim, (iii) upon such other terms as may be agreed upon by such holder and Debtor, (iv) if the Plan is confirmed under section 1191(b) of the Bankruptcy Code, pro-rata  over the period (a) starting on the first day of the month immediately following the month in which the order on the application by the holder of an Allowed Administrative Expenses Claim became a Final Order and (b) ending on the first day of the month in which the Final Distribution is due, or (v) as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims representing obligations incurred by Debtor in the ordinary course of business after the Filing Date, or otherwise assumed by Debtor on the Effective Date pursuant to this Plan, including any tax obligations arising after the Effective Date, will be paid or performed by Debtor when due in accordance with the terms and conditions of the particular agreements or non-bankruptcy law governing such obligations. Debtor is paying post-petition bills and does not expect any claims for unpaid post-petition goods and services other than possible professional fees.

     5.    *Application for Administrative Expense Claim.* Except as otherwise provided in this Plan, any Person holding an Administrative Expense Claim, other than an Administrative Expense Claim arising from the operation by Debtor of its business in the ordinary course of business, shall file an application for allowance of such Administrative Expense Claim with the Bankruptcy Court within thirty (30) days after the Confirmation Date.  At the same time any Person files an Administrative Expense Claim, such Person shall also serve a copy of the Administrative Expense Claim upon counsel for Debtor and the Subchapter V Trustee.  Any Person who fails to timely file and serve an application for allowance of an Administrative Expense Claim shall be forever barred from seeking payment of such Administrative Expense Claims by Debtor or the Estate.

     6.    *Professional Fees.* Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within thirty (30) days after the Confirmation Date or by such other deadline as may be fixed by the Bankruptcy Court.

     7.    *Post-Confirmation Professional Fees.* Debtor may pay professional fees incurred after confirmation of the Plan without Court approval, other than the fees of the Subchapter V Trustee, which must be approved by the Court.

## Article 7
## Means for the Implementation of the Plan

     1.    *Parties Responsible for Implementation of the Plan.*  Upon confirmation, Debtor will be charged with administration of the Case.  Debtor will be authorized and empowered to take such actions as are required to effectuate the Plan. Debtor will file all post-confirmation reports required by the United States Trustee's office.  Debtor will also file the necessary final reports and may apply for a final decree after substantial consummation at such time as debtor deems appropriate unless otherwise required by the Bankruptcy Court. Debtor shall be authorized to

reopen this case after the entry of a Final Decree to enforce the terms of the Plan including for the purpose of seeking to hold a party in contempt or to enforce the confirmation or discharge injunction or otherwise afford relief to Debtor.

2.  *Sources of Cash for Distribution*.

2.1.  The source of funds for the payments pursuant to the Plan is Debtor's salary.

2.2.  A copy of Debtor's post-confirmation monthly projections is set forth on **Exhibit "A"** to this Plan.  Debtor's projections are based on Debtor's previous revenue and expenses and projected revenue and expenses.  Debtor is able to reasonably project income and expenses based on such information.

2.3.  Debtor may maintain bank accounts under the confirmed Plan in the ordinary course of business.  Debtor may also pay ordinary and necessary expenses of administration of the Plan in due course.

3.  *Preservation of Causes of Action*.  In accordance with section 1123(b)(3) of the Bankruptcy Code, Debtor will retain and may (but is not required to) enforce all Retained Actions. After the Effective Date, Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  Debtor (or any successors, in the exercise of their sole discretion), may pursue such Retained Actions so long as it is the best interests of Debtor (or any successors holding such rights of action).  The failure of Debtor to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by Debtor of such claim, right of action, suit, proceeding or other Retained Action, and Debtor will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions in Debtor's sole discretion and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Retained Actions upon or after the confirmation or consummation of this Plan. Debtor reserves all causes of actions for breach of any former or now existing agreement or otherwise.  Debtor specifically reserves any cause of action against any of Debtor's account debtors related to underpayment or non-payment of any fees, or other monies or receivables due. The Plan shall not be deemed a waiver of any right of Debtor to collect any receivable or right to payment under any applicable laws.  Debtor expressly reserves the right to exercise any and all remedies available to Debtor regarding its accounts receivable or rights to payment at law or in equity, at such time or times as Debtor from time to time may elect. This Plan is filed with a full reservation of rights.  Any failure by Debtor to assert or set forth the occurrence of any other default or events of default which may have occurred shall not be deemed to be a waiver, release or estoppel of such other default or event of default.  Debtor hereby expressly reserves the right to declare any such other default or event of default and to take such other action as Debtor may be entitled to applicable law.  No delay on the part of Debtor in exercising any right or remedy shall operate as a waiver in whole or in part of any right or remedy. This Plan is filed with a full reservation of rights.  Without limitation of the foregoing, Debtor specifically reserves all claims under all Subcontractor Agreements listed on Schedule G against the counterparties listed.

4.      *Effectuating Documents, Further Transactions*.  Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such action as may be necessary, desirable or appropriate to effectuate and further evidence the terms and conditions of this Plan or to otherwise comply with applicable law.

5.      *Exemption from Certain Transfer Taxes and Recording Fees*.  Pursuant to 11 U.S.C. § 1146(a), O.C.G.A. §48-6-65(a)(2), Ga. Comp. R. & Regs. R. 560-11-8.14 and any other applicable laws, codes or regulations, any transfers from Debtor to any other Person or entity pursuant to or in contemplation of this Plan, or any agreement regarding the transfer of title to or ownership of any of Debtor's real or personal property will not be subject to any document recording tax, stamp tax, conveyance fee, sales tax, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment. Without limitation of the foregoing, the Confirmation Order may direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

6.      *Further Authorization*.  Debtor shall be entitled to seek such orders, judgments, injunctions and rulings as it deems necessary or desirable to carry out the intentions and purposes, and to give full effect to the provisions, of this Plan.

7.      *Liabilities of Debtor*.  Debtor will not have any liabilities except those expressly stated or assumed under the Plan. Debtor will be responsible for all expenses incurred by Debtor in the ordinary course of business after the Filing Date, and those expenses will be paid in the ordinary course of business as they become due or as agreed upon by holders of the expense claim.

## Article 8
## Distributions

1.      *Disbursing Agent*.    Unless otherwise expressly provided for herein, all Distributions under this Plan shall be made by Debtor or its agent.

2.      *Distributions of Cash*.  Any Distribution of Cash made by Debtor pursuant to this Plan shall, at Debtor's option, be made by check drawn on a domestic bank or by wire transfer from a domestic bank or in any other form of cash or cash equivalent.

3.      *No Interest, Fees, Costs or Attorney Fees on Claims or Interests*.  Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a postpetition agreement in writing between the Debtor and a Holder, postpetition interest, fees, costs or attorney fees shall not accrue or be paid on Claims, and no Holder shall be entitled to interest, fees, costs or attorney fees accruing on or after the Filing Date through and including the Effective Date on any Claim.  Additionally, and without limiting the foregoing, interest, fees, costs and attorney fees shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final determination is made when and if such Disputed Claim becomes an

Allowed Claim. The provisions of the section of the Plan shall include and pertain to, without limitation, any such claim for post-petition interest, fees, costs or attorney fees pursuant to 11 U.S.C. §§ 503, 506 or 507.

4.    *Delivery of Distributions*.  The Distribution to a Holder of an Allowed Claim shall be made by Debtor or the Subchapter V Trustee (as applicable) (a) at the address set forth on the proof of claim filed by such Holder, (b) at the address set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if the Holder's address is not listed in the Schedules, at the last known address of such Holder according to the Debtor's books and records. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until Debtor or Subchapter V Trustee (as applicable) is notified by such Holder in writing of such Holder's then-current address, at which time Debtor or Subchapter V Trustee (as applicable) shall recommence Distributions to such Holder without interest but further provided that (i) any distributions not claimed within 6 months of return shall be irrevocably retained by Debtor and (ii) such Holder shall waive its right to such Distributions. All Distributions returned to Debtor or Subchapter V Trustee (as applicable) and not claimed within six (6) months of return shall be irrevocably retained by Debtor notwithstanding any federal or state escheat laws to the contrary.

If any Distribution on an Unsecured Claim ("Unsecured Distribution") is tendered by Debtor or the Subchapter V Trustee (as applicable) to a Holder of an Unsecured Claim and returned, refused or otherwise improperly returned ("Unsecured Distribution Refusal"), Debtor or the Subchapter V Trustee (as applicable) shall not be responsible for making any further Unsecured Distribution on account of such Unsecured Claim.  Accordingly, in the event of an Unsecured Distribution Refusal, Debtor or the Subchapter V Trustee (as applicable) shall be relieved of any obligation to make said payment or Distribution and Debtor or the Subchapter V Trustee (as applicable) is relieved of any obligation to make further payments or Distributions on such Unsecured Claim under the Plan.

If any Distribution on a Secured Claim or Priority Claim ("Secured or Priority Distribution") is tendered by Debtor or the Subchapter V Trustee (as applicable) to a Holder of a Secured Claim or Priority Claim and returned, refused or otherwise improperly returned ("Secured or Priority Distribution Refusal"), the Holder of such Secured Claim or Priority Claim, as applicable, shall be deemed to have waived its right to such tendered payment or Distribution and such tendered payment or Distribution shall be deemed satisfied.  In the event of a Secured or Priority Distribution Refusal, any obligation of Debtor or the Subchapter V Trustee (as applicable) to make any additional or further payment on such Secured Claim or Priority Claim shall be tolled until such time as: (i) notice is provided to Debtor that the Holder of such Secured Claim or Priority Claim seeks to receive payments from Debtor on the Secured Claim or Priority Claim or otherwise seeks to enforce Debtor's obligations under the Plan or otherwise enforce the Secured Claim or Priority Claim and (ii) any dispute regarding the Secured or Priority Distribution Refusal and its implications is resolved by agreement of the parties or the Bankruptcy Court (the "Tolling Period").  Only in the event of such notice to Debtor shall Debtor's or the Subchapter V Trustee's (as applicable) obligations to perform as to the applicable Secured Claim or Priority Claim resume. The Tolling Period shall: (i) extend the term of the payments on such Secured Claim or Priority

Claim and (ii) bar any interest from accruing on the Secured Claim or Priority Claim until such time as any dispute regarding the Secured or Priority Distribution Refusal shall be resolved by a Final Order of the court.  Notwithstanding anything in the Plan or otherwise to the contrary, no provision allowing the imposition of late fees, default interest, late charges, damages, or costs and fees against the Debtor or the Debtor's property shall be applicable during the Tolling Period or any period during which a dispute regarding a Tolling Period is being resolved.  For purposes of clarification, Debtor or the Subchapter V Trustee (as applicable) shall not be required to make any lump sum cure of payments or Distributions which would have otherwise come due during the Tolling Period or any period during which a dispute regarding a Tolling Period is unresolved, and Debtor or the Subchapter V Trustee (as applicable) shall recommence Distributions upon the resolution of such on the terms in the Plan as tolled.

5.      *Distributions to Holders as of the Record Date*.  All Distributions on Allowed Claims shall be made to the Record Holders of such Claims.  As of the close of business on the Record Date, the Claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Record Holder of any Claim.  Debtor shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  Debtor shall instead be entitled to recognize and deal for all purposes under this Plan with the Record Holders as of the Record Date.

6.      *Fractional Dollars*.  Any other provision of this Plan notwithstanding, the Debtor or the Subchapter V Trustee (as applicable) shall not be required to make Distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under this Plan would otherwise be called for, at Debtor's or the Subchapter V Trustee's (as applicable) option the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

7.      *Withholding Taxes*.  Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under this Plan shall be subject to any such withholding and reporting requirements.

**Article 9**
**Procedures for Treating and Resolving Disputed Claims**

1.      *Objections to Claims*.  Debtor shall be entitled to object to Claims, provided, however, that Debtor shall not be entitled to object to Claims (i) that have been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date, or (ii) that are Allowed by the express terms of this Plan.

2.      *No Distributions Pending Allowance*.  Except as otherwise provided herein, no Distributions will be made with respect to any portion of a Claim unless and until (i) no objection to such Claim has been filed, or (ii) any objection to such Claim has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

3.      *Resolution of Claims Objections*.  On and after the Confirmation Date, Debtor shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims without approval of the Bankruptcy Court.

### Article 10
### Provision for Assumption of Unexpired
### Leases and Executory Contracts

*1.      Provisions Regarding Executory Contracts.*

Any unexpired leases or executory contracts which are not assumed under the Plan or are the subject of a pending motion to assume as of the Confirmation Date shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code on the Confirmation Date.  Under the terms of the Plan, a proof of claim for damages arising from such rejection must be filed in compliance with the Bankruptcy Rules on or before sixty (60) days after the Confirmation Date.  Any claims which are not timely filed will be disallowed and discharged.

### Article 11
### Effect of Plan on Claims and Interests

1.      *Vesting of Debtor's Assets*.    Except as otherwise explicitly provided in the Plan, upon the Court's entry of the Confirmation Order, all property comprising the Estate (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor free and clear of all Claims, Liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in the Plan.  As of the earlier of the Effective Date and the entry of a Final Decree, Debtor may operate its business and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order and, in the case of a Plan confirmed under § 1191(b), the supervision of the Subchapter V Trustee.

2.      *Discharge of Debtor.*

2.1.    Discharge if Plan Confirmed Under Section 1191(a).  In the event the Plan is confirmed under Section 1191(a), the Debtor shall receive a discharge as provided for under Section 1141(d) upon the Confirmation Date. Without limitation of such discharge but in addition thereto, the Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

2.2.    Discharge if Plan Confirmed Under Section 1191(b). If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of the payment of

all payments expressly provided for under this Plan due within five (5) years of the Effective Date, the Court shall grant Debtor a discharge. The Distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims and Causes of Action against Debtor, whether known or unknown, including any and all liabilities of Debtor, Liens on Debtor's assets, obligations of Debtor, rights against Debtor, and Interests in Debtor or its Estate that arose prior to the Effective Date regardless of whether a claimant accepted or rejected the Plan.

3.      *Setoffs*. Debtor may, but shall not be required to, set off or recoup against any Claim, and the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that Debtor may have now or in the future against such Holder; but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Debtor of any such claim that Debtor may have against such Holder.

4.      *Exculpation and Limitation of Liability*.  Under the Plan, Debtor's current and/or post-Filing Date and pre-Effective Date members, officers, directors, employees, advisors, attorneys, representatives, financial advisors, investment bankers, or agents and any of such parties' successors and assigns, shall not have or incur, and shall be released from, any claim, obligation, cause of action, or liability to one another or to any Holder of any Claim or Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, financial advisor, attorneys, or Affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, the negotiation and filing of the Plan, the filing of the Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan, except for their willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.  No Holder of any Claim or Interest, or other party in interest, none of their respective agents, employees, representatives, financial advisors, or Affiliates, and no successors or assigns of the foregoing, shall have any right of action against the parties listed in this provision for any act or omission in connection with, relating to, or arising out of the Bankruptcy Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan.  Fees and expenses which Debtor owes to its Professionals and to the Subchapter V Trustee are excluded from this Exculpation.

5.      *Injunction*.      The Confirmation Order shall act as a permanent injunction against any Person: (a) commencing or continuing any action, (b) employing any process, or (c) any acting to collect, offset, or recover any Claim except as provided for in this Plan against: (1) Debtor, or (2) against any property of Debtor. Such injunction shall survive the closure of the Bankruptcy Case and this Court shall retain jurisdiction to enforce such injunction. Such injunction shall remain in effect as to each creditor for so long as payments to such creditor are provided for by the Plan.

6.      *Effect of Confirmation*.

6.1.    <u>Binding Effect</u>.  On the Confirmation Date, the provisions of this Plan shall be binding on Debtor, the Estate, all Holders of Claims against or Interests in Debtor, and all other parties-in-interest whether or not such Holders are Impaired and whether or not such

Holders have accepted this Plan. Creditors shall have no right to enforce a Claim against Debtor, even following a default under the Plan, except to the extent and amount that any Claim of such creditor is provided for and then due under the Plan.

6.2.    <u>Filing of Reports</u>.  Debtor shall file all reports required by the Bankruptcy Code, Bankruptcy Rules, the Subchapter V Trustee, U.S. Trustee guidelines, and the rules and orders of the Bankruptcy Court.

6.3.    <u>Post-Effective Date Retention of Professionals</u>.  Upon the Effective Date, any requirement that professionals comply with §§ 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate, and Debtor will employ and pay professionals in their ordinary course of business.

**Article 12**
**Conditions Precedent**

1.    *Conditions to the Effective Date.*  The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 12.2 of this Plan.

1.1.1.    The Confirmation Order shall not have been vacated, reversed or modified and, as of the Effective Date, shall not have been stayed;

1.1.2.    All documents and agreements to be executed on the Effective Date or otherwise necessary to implement this Plan shall be in form and substance that is acceptable to Debtor in its reasonable discretion;

1.1.3.    Debtor shall have received any authorization, consent, regulatory approval, ruling, letter, opinion, or document that may be necessary to implement this Plan and that is required by law, regulation, or order.

2.    *Waiver of Conditions to Confirmation or Consummation*.  The conditions set forth in Article 12.1 of this Plan may be waived, in whole or in part, by Debtor without any notice to any other parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by Debtor in its sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by Debtor).  The failure of Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

**Article 13**
**Retention and Scope of Jurisdiction of the Bankruptcy Court**

1.    *Retention of Jurisdiction*.  Subsequent to the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

1.1.    To adjudicate objections concerning the allowance, priority or classification of Claims and any subordination thereof, and to establish a date or dates by which objections to Claims must be filed to the extent not established herein;

1.2.    To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, to establish the amount of any reserve required to be withheld from any distribution under this Plan on account of any disputed, contingent or unliquidated Claim;

1.3.    To resolve all matters related to the rejection, and assumption and/or assignment of any Executory Contract or Unexpired Lease of Debtor;

1.4.    To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by Debtor[2];

1.5.    To hear and rule upon all applications for Professional Compensation, including the Subchapter V Trustee;

1.6.    To remedy any defect or omission or reconcile any inconsistency in this Plan, as may be necessary to carry out the intent and purpose of this Plan;

1.7.    To construe or interpret any provisions in this Plan and to issue such orders as may be necessary for the implementation, execution and consummation of this Plan, to the extent authorized by the Bankruptcy Court;

1.8.    To adjudicate controversies arising out of the administration of the Estates or the implementation of this Plan;

1.9.    To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of this Plan, including the Distribution of funds from the Estate and the payment of claims;

1.10.    To determine any suit or proceeding brought by Debtor to recover property under any provisions of the Bankruptcy Code;

1.11.    To hear and determine any tax disputes concerning Debtor and to determine and declare any tax effects under this Plan;

1.12.    To determine such other matters as may be provided for in this Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

---

2 Notwithstanding anything to the contrary in the Plan, Debtor shall be authorized to file any Retained Action related to the collection of accounts receivable in any state or local court with jurisdiction under applicable state law.

1.13.    To determine any controversies, actions or disputes that may arise under the provisions of this Plan, or the rights, duties or obligations of any Person under the provisions of this Plan;

1.14.    To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of, or in connection with, any agreement pursuant to which Debtor sold any of its assets during the Bankruptcy Case; and

1.15.    To enter a final decree.

1.16.    To enter an order of discharge.

1.17.    To enforce and interpret any order or injunctions entered in this Bankruptcy Case.

2.    *Alternative Jurisdiction*.  In the event that the Bankruptcy Court is found to lack jurisdiction to resolve any matter, then the District Court shall hear and determine such matter.  If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.  Notwithstanding anything to the contrary herein, Debtor shall be authorized to bring any action related to a lease, contract or account (including any account receivable due to Debtor) to which Debtor is a party in any state or local court having jurisdiction over such action.

3.    *Final Decree*.  If the Plan is confirmed, the Bankruptcy Court may, upon application of Debtor, at any time after "substantial consummation" of the Plan as defined in section 1101(2) of the Bankruptcy Code, enter a final decree in the case, notwithstanding the fact that additional funds may eventually be distributed to parties in interest. In such event, the Bankruptcy Court may enter an Order closing this case pursuant to section 350 of the Bankruptcy Code, provided, however, that: (a) Debtor shall continue to have the rights, powers, and duties set forth in this Plan; (b) any provision of this Plan requiring the absence of an objection shall no longer be required except as otherwise ordered by the Bankruptcy Court; and (c) the Bankruptcy Court may from time to time reopen the Bankruptcy Case if appropriate under applicable law, including without limitation any of the following purposes: (1) administering Assets; (2) entertaining any adversary proceedings, contested matters or applications Debtor has brought or brings with regard to the liquidation of Assets and the prosecution of Causes of Action or otherwise administering the Plan; (3) enforcing or interpreting this Plan or supervising its implementation; or (4) for other cause.

## Article 14
## Miscellaneous Provisions

1.    *Modification of the Plan*.  Debtor shall be allowed to modify this Plan pursuant to section 1193 of the Bankruptcy Code to the extent applicable law permits.

2.    *Pre-Confirmation Modifications.* Debtor may modify the Plan at any time before the Confirmation Hearing by filing the modification with the Court.

3.     *Modification After Confirmation And Prior to Substantial Consummation.* Debtor may modify the Plan upon a showing that circumstances warrant such a modification and after a notice and hearing. If the Plan was confirmed under section 1191(a), any holder of a claim or interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the plan as modified, unless, within the time fixed by the Court, such holder changes its previous acceptance or rejection.

4.     *Modification After Substantial Consummation.* If the Plan has been confirmed under section 1191(b), Debtor may modify the Plan upon a showing the circumstances warrant such a modification and after a notice and hearing. Debtor shall have the right to modify the Plan for at least five years following the Effective Date.

5.     *Force Majeure.* Without limitation of any other provisions of the Plan, the laws of force majeure shall apply to the Plan and Debtor's compliance with the Plan. Any Person with obligation under this Plan will not be required to perform any obligation under this Plan or be liable for damages to any other Person to whom performance is otherwise owed under this Plan so long as the performance or non-performance of the obligation is delayed, caused, or prevented by an act of God or force majeure. An "act of God" or "force majeure" is defined as hurricanes, earthquakes, floods, fire, or any similar, substantial natural event, pandemics, laws, orders of government, and any other cause not reasonably within the control of such Person with obligations under the Plan and which by the exercise of due diligence the non-performing Party is unable in whole or in part to prevent or overcome. All time periods for such performance will be extended for the period that the act of God or force majeure is in place. Debtor further expressly reserved the right to modify this Plan pursuant to Article 14 of the Plan upon the occurrence of an act of God or force majeure. Debtor shall retain the right to reopen this Bankruptcy Case and seek other relief pursuant to 11 U.S.C. § 305(a) for any reason, so long as the Bankruptcy Court finds that such suspension is in the interests of creditors and the debtor.

6.     *Allocation of Plan Distributions Between Principal and Interest.* To the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, to the extent permitted by applicable law, be allocated for United States federal income tax purposes to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

7.     *Applicable Law.* Except to the extent that the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under this Plan shall be governed by the laws of the State of Georgia. Without regard to application of any principles of law respecting conflicts of law.

8.     *Preparation of Estate Returns and Resolution of Tax Claims.* Debtor shall file all tax returns and other filings with governmental authorities and may file determination requests under section 505(b) of the Bankruptcy Code to resolve any Disputed Claim relating to taxes with a governmental authority.

9.      *Headings*.  The headings of the Articles and the sections of this Plan have been used for convenience only and shall not limit or otherwise affect the meaning thereof.

10.     *Revocation of Plan*.  Debtor reserves the right, unilaterally and unconditionally, to revoke and/or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation and/or withdrawal this Plan shall be deemed null and void and of no force and effect.

11.     *No Admissions; Objection to Claims*.  Nothing in this Plan shall be deemed to constitute an admission that any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity or person as being the Holder of a Claim is the Holder of an Allowed Claim, except as expressly provided in this Plan. The failure of Debtor to object to or examine any Claim for purposes of voting shall not be deemed a waiver of Debtor's rights to object to or reexamine such Claim in whole or in part.

12.     *No Bar to Suits*.  Except as otherwise provided in Article 11 of this Plan, neither this Plan or confirmation hereof shall operate to bar or estop Debtor from commencing any Cause of Action, or any other legal action against any Holder of a Claim or any individual, corporation, partnership, trust, venture, governmental unit, or any other form of legal entity, whether such Cause of Action, or any other legal action arose prior to or after the Confirmation Date and whether or not the existence of such Cause of Action, or any other legal action was disclosed in any document filed by Debtor in connection with this Bankruptcy Case or whether or not any payment was made or is made on account of any Claim. Without limitation, Debtor retains and reserves the right to prosecute Retained Actions.

13.     *Exhibits/Schedules*.  All exhibits and schedules to this Plan, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

## Article 15
## Tax Consequences

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class. Significant tax consequences may occur as a result of confirmation of the Plan under the Internal Revenue Code and pursuant to state, local, and foreign tax statutes.  Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only.  No specific tax consequences to any Creditor or Holders of an Interest are represented, implied, or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation. The Debtor assumes no responsibility for the tax effect that consummation of the Plan will have on any given Holder of a Claim or Interest.  Holders of Claims or Interest are strongly urged to consult their own tax advisors covering the federal, state, local and foreign tax consequences of the Plan to their individual situation.

Respectfully submitted this 6th day of November, 2020.

**AP FRAMING, INC.**

By:   */s/Uriel Espinoza*
Name: Uriel Espinoza


**JONES & WALDEN LLC**

*/s/ Cameron M. McCord*
Cameron M. McCord
Georgia Bar No. 143065
699 Piedmont Ave NE
Atlanta, Georgia 30308
(404) 564-9300
Attorney for Debtor in Possession

**Exhibit A**

**Monthly Budget**

# AP Framing Inc
## Profit & Loss Forecast Overview
### For years ending December - 2021, 2022, 2023, 2024, 2025

| | Jan - Dec 21 | Jan - Dec 22 | Jan - Dec 23 | Jan - Dec 24 | Jan - Dec 25 | TOTAL | % |
|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | |
| **Income** | | | | | | | |
| **Construction Income** | 8,920,000.00 | 9,110,300.00 | 9,260,000.00 | 9,350,000.00 | 9,460,000.00 | 46,100,300.00 | **100.00** |
| **Total Income** | 8,920,000.00 | 9,110,300.00 | 9,260,000.00 | 9,350,000.00 | 9,460,000.00 | 46,100,300.00 | |
| **Cost of Goods Sold** | | | | | | | |
| **Blueprints and Reproduction** | 4,427.76 | 4,522.22 | 4,596.53 | 4,641.21 | 4,695.81 | 22,883.53 | **0.05** |
| **Construction Materials Costs** | 438,078.94 | 468,759.03 | 492,893.61 | 507,403.37 | 525,137.53 | 2,432,272.48 | **5.28** |
| **Equipment Rental for Jobs** | 693,318.78 | 703,843.28 | 712,122.41 | 717,099.84 | 723,183.37 | 3,549,567.69 | **7.70** |
| **Subcontractors Expense** | 6,310,094.78 | 6,444,714.85 | 6,550,614.09 | 6,614,280.96 | 6,692,096.03 | 32,611,800.72 | **70.74** |
| **Tools and Small Equipment** | 19,108.15 | 19,515.81 | 19,836.49 | 20,029.29 | 20,264.93 | 98,754.67 | **0.21** |
| **Worker's Compensation Insurance** | 61,233.83 | 61,793.51 | 62,233.78 | 62,498.47 | 27,821.98 | 275,581.57 | **0.60** |
| **Total COGS** | 7,526,262.25 | 7,703,148.71 | 7,842,296.91 | 7,925,953.14 | 7,993,199.65 | 38,990,860.65 | **84.58** |
| **Gross Profit** | 1,393,737.75 | 1,407,151.29 | 1,417,703.09 | 1,424,046.86 | 1,466,800.35 | 7,109,439.35 | **15.42** |
| **Expense** | | | | | | | |
| **Accounting Expenses** | 11,200.00 | 11,800.00 | 11,800.00 | 12,400.00 | 12,400.00 | 59,600.00 | **0.15** |
| **Auto and Truck Expenses** | | | | | | | |
| **Tolls** | 32.80 | 33.50 | 34.05 | 34.38 | 34.79 | 169.52 | **0.00** |
| **Parking Expenses** | 2,363.43 | 2,413.85 | 2,453.51 | 2,477.36 | 2,506.50 | 12,214.65 | **0.03** |
| **Transportation** | 150.00 | 154.00 | 156.00 | 160.00 | 200.00 | 820.00 | **0.00** |
| **Auto Insurance** | 4,445.58 | 4,540.42 | 4,615.03 | 4,659.88 | 4,714.70 | 22,975.61 | **0.05** |
| **Auto Repairs and Maintenance** | 2,554.86 | 2,609.37 | 2,652.25 | 2,678.03 | 2,709.53 | 13,204.04 | **0.03** |
| **Car Care Plan** | 89.56 | 91.47 | 92.97 | 93.87 | 94.98 | 462.85 | **0.00** |
| **Dent Repair Plan** | 35.82 | 36.59 | 37.19 | 37.55 | 37.99 | 185.14 | **0.00** |
| **GAP** | 138.41 | 141.37 | 143.69 | 145.09 | 146.79 | 715.35 | **0.00** |
| **Gasoline** | 80,073.22 | 80,821.48 | 81,410.09 | 81,763.97 | 82,196.49 | 406,265.26 | **0.88** |
| **Performance Service Contract** | 435.92 | 445.22 | 452.53 | 456.93 | 462.31 | 2,252.90 | **0.00** |
| **Personal Property Taxes** | 560.69 | 572.65 | 582.06 | 587.72 | 594.64 | 2,897.77 | **0.01** |
| **Road Hazard Plan** | 80.60 | 82.32 | 83.67 | 84.49 | 85.48 | 416.56 | **0.00** |
| **Tag** | 496.95 | 507.56 | 515.90 | 520.91 | 527.04 | 2,568.36 | **0.01** |
| **Tire** | 178.37 | 182.18 | 185.17 | 186.97 | 189.17 | 921.87 | **0.00** |
| **Total Auto and Truck Expenses** | 91,636.22 | 92,631.96 | 93,414.12 | 93,887.15 | 94,500.41 | 466,069.86 | **1.01** |
| **Bank Service Charges** | | | | | | | |
| **Bank Fees** | 1,895.00 | 1,253.00 | 1,273.00 | 1,286.00 | 1,301.00 | 7,008.00 | **0.02** |

**AP Framing Inc**
# Profit & Loss Forecast Overview
### For years ending December - 2021, 2022, 2023, 2024, 2025

| | Jan - Dec 21 | Jan - Dec 22 | Jan - Dec 23 | Jan - Dec 24 | Jan - Dec 25 | TOTAL | % |
|---|---|---|---|---|---|---|---|
| **Total Bank Service Charges** | 1,895.00 | 1,253.00 | 1,273.00 | 1,286.00 | 1,301.00 | 7,008.00 | **0.02** |
| **Business Licenses and Permits** | 4,016.41 | 4,059.42 | 4,093.26 | 4,113.61 | 4,138.47 | 20,421.18 | **0.04** |
| **Commercial Property Tax** | | | | | | | |
| **Computer and Internet Expenses** | | | | | | | |
| Computer | 691.33 | 706.08 | 717.68 | 724.65 | 733.18 | 3,572.92 | **0.01** |
| Computer and Internet Expenses - Othe | 5,593.43 | 606.09 | 616.05 | 622.04 | 629.35 | 8,066.95 | **0.02** |
| **Total Computer and Internet Expenses** | 6,284.76 | 1,312.16 | 1,333.73 | 1,346.69 | 1,362.53 | 11,639.87 | **0.03** |
| **Depreciation Expense** | 20,452.00 | 12,063.00 | 9,455.00 | 8,465.00 | 8,465.00 | 58,900.00 | **0.13** |
| **Donations and Contributions** | 700.00 | 720.00 | 730.00 | 740.00 | 750.00 | 3,640.00 | **0.01** |
| **Due and Suscriptions** | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 750.00 | **0.00** |
| **Fuel** | 36.75 | 37.53 | 38.15 | 38.52 | 38.97 | 189.91 | **0.00** |
| **Gift** | 25.00 | 25.00 | 25.00 | 25.00 | 25.00 | 125.00 | **0.00** |
| **Hotels & Lodges** | 93,380.35 | 95,372.54 | 96,939.70 | 97,881.87 | 99,033.43 | 482,607.89 | **1.05** |
| **Insurance Expense** | | | | | | | |
| Health Insurance | | | | | | | |
| Commercial Property Insurance | 140.64 | 143.64 | 146.00 | 147.42 | 149.15 | 726.85 | **0.00** |
| General Liability | 13,601.63 | 13,721.13 | 13,815.14 | 13,871.66 | 5,940.74 | 60,950.31 | **0.13** |
| Office Insurance | 345.17 | 352.53 | 358.32 | 361.80 | 366.06 | 1,783.88 | **0.00** |
| Renters Insurance | 2,048.25 | 2,091.95 | 2,126.32 | 2,146.99 | 2,172.25 | 10,585.76 | **0.02** |
| Umbrella Ins | | 57.33 | 58.27 | 58.84 | 59.53 | 233.96 | **0.00** |
| **Total Insurance Expense** | 16,135.68 | 16,366.58 | 16,504.06 | 16,586.71 | 8,687.73 | 74,280.76 | **0.16** |
| **Interest Expense** | 2,886.10 | 2,947.67 | 2,996.11 | 3,025.23 | 3,060.82 | 14,915.92 | **0.03** |
| **Meals and Entertainment** | 1,407.67 | 1,437.70 | 1,461.32 | 1,475.53 | 1,492.88 | 7,275.10 | **0.02** |
| **Medical Expenses** | | | | | | | |
| **Office Expenses** | | | | | | | |
| Software Expenses | 1,093.22 | 1,116.54 | 1,134.89 | 1,145.92 | 1,159.40 | 5,649.97 | **0.01** |
| Office Supplies | 6,775.09 | 6,780.96 | 6,785.58 | 6,788.35 | 6,791.75 | 33,921.74 | **0.07** |
| **Total Office Expenses** | 7,868.31 | 7,897.50 | 7,920.47 | 7,934.27 | 7,951.15 | 39,571.70 | **0.09** |
| **Payroll Expenses** | | | | | | | |
| Employee Salaries and wages | 154,603.32 | 156,514.92 | 158,018.69 | 158,922.76 | 160,027.73 | 788,087.41 | **1.71** |
| Officer Salaries and Wages | 254,048.32 | 256,694.78 | 258,776.62 | 260,028.23 | 261,557.97 | 1,291,105.91 | **2.80** |
| Payroll Taxes | 29,226.40 | 29,380.57 | 7,501.85 | 7,574.76 | 7,663.88 | 81,347.47 | **0.18** |
| Hourly Employees | 3,287.64 | 3,357.78 | 3,412.95 | 3,446.13 | 3,486.67 | 16,991.17 | **0.04** |

Case 20-68856-jwc    Doc 73    Filed 11/06/20    Entered 11/06/20 11:36:48    Desc Main
Document    Page 37 of 39

# AP Framing Inc
## Profit & Loss Forecast Overview
### For years ending December - 2021, 2022, 2023, 2024, 2025

| | Jan - Dec 21 | Jan - Dec 22 | Jan - Dec 23 | Jan - Dec 24 | Jan - Dec 25 | TOTAL | % |
|---|---|---|---|---|---|---|---|
| **Total Payroll Expenses** | 441,165.68 | 445,948.05 | 427,710.11 | 429,971.87 | 432,736.25 | 2,177,531.96 | **4.72** |
| **Penalties and Fees** | 278.05 | 283.98 | 288.64 | 291.45 | 294.88 | 1,437.00 | **0.00** |
| **Postage and Shipping** | 1,980.36 | 2,022.61 | 2,055.84 | 2,075.83 | 2,100.25 | 10,234.89 | **0.02** |
| **Professional Fees** | 18,095.39 | 18,481.44 | 18,785.12 | 18,967.70 | 19,190.85 | 93,520.49 | **0.20** |
| **Rent Expense** | | | | | | | |
|     **Office** | 47,359.52 | 36,000.00 | 36,000.00 | 36,000.00 | 36,000.00 | 191,359.52 | **0.42** |
|     **Apartmets Rent for Workers** | 298,475.12 | 300,575.99 | 302,228.65 | 303,222.23 | 304,436.61 | 1,508,938.61 | **3.27** |
|     **Rent Truck and Car** | 2,431.57 | 2,483.44 | 2,524.25 | 2,548.79 | 2,578.77 | 12,566.82 | **0.03** |
|     **Storage Rent** | 7,310.99 | 7,466.97 | 7,589.66 | 7,663.43 | 7,753.59 | 37,784.65 | **0.08** |
| **Total Rent Expense** | 355,577.20 | 346,526.40 | 348,342.57 | 349,434.45 | 350,768.97 | 1,750,649.59 | **3.80** |
| **Repairs and Maintenance** | | | | | | | |
|     **Equipment Repairs** | 103.89 | 106.10 | 107.85 | 108.89 | 110.17 | 536.90 | **0.00** |
|     **Office Repairs and Maintenance** | 3,348.36 | 3,419.79 | 3,475.99 | 3,509.77 | 3,551.06 | 17,304.98 | **0.04** |
| **Total Repairs and Maintenance** | 3,452.25 | 3,525.90 | 3,583.83 | 3,618.67 | 3,661.24 | 17,841.88 | **0.04** |
| **Safety Expenses** | 2,896.85 | 2,958.65 | 3,007.26 | 3,036.49 | 3,120.00 | 15,019.25 | **0.03** |
| **Taxes** | | | | | | | |
|     **Payroll Taxes** | | | | | | | |
|         **940** | 30.09 | 30.73 | 31.24 | 31.54 | 31.91 | 155.52 | **0.00** |
|         **941** | 4,351.82 | 4,444.66 | 4,517.70 | 4,561.61 | 4,615.27 | 22,491.07 | **0.05** |
|         **DOL** | 12.95 | 13.23 | 13.44 | 13.57 | 13.73 | 66.93 | **0.00** |
|     **Total Payroll Taxes** | 4,394.86 | 4,488.62 | 4,562.38 | 4,606.72 | 4,660.92 | 22,713.51 | **0.05** |
| **Total Taxes** | 4,394.86 | 4,488.62 | 4,562.38 | 4,606.72 | 4,660.92 | 22,713.51 | **0.05** |
| **Telephone Expense** | 4,898.90 | 5,003.41 | 5,085.62 | 5,135.05 | 5,195.47 | 25,318.45 | **0.05** |
| **Temporary Work** | 3,005.15 | 3,069.26 | 3,119.69 | 3,150.01 | 3,187.07 | 15,531.18 | **0.03** |
| **Third Party Damage** | 376.14 | 384.16 | 390.47 | 394.27 | 398.91 | 1,943.95 | **0.00** |
| **Training and Education Expenses** | 1,461.77 | 1,492.95 | 1,517.48 | 1,532.23 | 1,550.26 | 7,554.70 | **0.02** |
| **Uniform Expense** | 118.41 | 120.94 | 122.93 | 124.12 | 125.58 | 611.99 | **0.00** |
| **Utilities** | | | | | | | |
|     **Water** | 1,185.19 | 1,210.47 | 1,230.36 | 1,242.32 | 1,256.94 | 6,125.29 | **0.01** |
|     **Internet** | 426.39 | 435.48 | 442.64 | 446.94 | 452.20 | 2,203.64 | **0.00** |
|     **Gas** | 2,642.38 | 2,698.76 | 2,743.10 | 2,769.76 | 2,802.35 | 13,656.36 | **0.03** |
|     **Electric** | 12,728.84 | 12,893.73 | 13,023.44 | 13,101.42 | 13,196.73 | 64,944.17 | **0.14** |
|     **Security** | 297.92 | 304.28 | 309.28 | 312.29 | 315.96 | 1,539.73 | **0.00** |

**AP Framing Inc**

# Profit & Loss Forecast Overview

**For years ending December - 2021, 2022, 2023, 2024, 2025**

|  | Jan - Dec 21 | Jan - Dec 22 | Jan - Dec 23 | Jan - Dec 24 | Jan - Dec 25 | TOTAL | % |
|---|---|---|---|---|---|---|---|
| **Total Utilities** | 17,280.73 | 17,542.72 | 17,748.83 | 17,872.73 | 18,024.18 | 88,469.19 | **0.19** |
| **Waste Expenses** | 139.57 | 142.55 | 144.89 | 150.00 | 150.00 | 727.02 | **0.00** |
| **Total Expense** | 1,113,045.53 | 1,099,915.71 | 1,084,449.59 | 1,089,567.18 | 1,088,372.21 | 5,475,350.22 | **11.88** |
| **Net Ordinary Income** | | | | | | | |
| **Other Income/Expense** | | | | | | | |
| **Other Income** | | | | | | | |
| **Interest Income** | | | | | | | |
| **Total Other Income** | | | | | | | |
| **Other Expense** | | | | | | | |
| **Ordinary Losses - Property** | | | | | | | |
| **Total Other Expense** | | | | | | | |
| **Net Other Income** | 280,692.22 | 307,235.58 | 333,253.50 | 334,479.68 | 378,428.14 | 1,634,089.13 | **3.54** |
| **% Income** | **3.15** | **3.37** | **3.60** | **3.58** | **4.00** | **3.54** | |

## CERTIFICATE OF SERVICE

I certify that on the date specified herein below I cause to be served a copy of the foregoing documents via first class United States mail and e-mail in a properly addressed envelope with sufficient postage affixed thereto to ensure delivery upon the parties listed below:

Office of the United States Trustee
362 Richard B. Russell Federal Bldg.
75 Ted Turner Drive, SW
Atlanta, Georgia 30303

This 6th  day of November, 2020

**JONES & WALDEN LLC**

*/s/ Cameron M. McCord*
Cameron M. McCord, Esq.
Georgia Bar No. 143065
699 Piedmont Ave NE
Atlanta, Georgia 30308
(404) 564-9300
Attorney for Debtor

35